UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| MELANIE ANNE HERMAN, | ) | Civil Action No.: 2:18-cv-1509-BHH |
|---|---|---|
| Plaintiff, | ) | |
| vs. | ) | **OPINION AND ORDER** |
| STEPHEN C. MILLER, MD, PALMETTO CARDIOLOGY AND VEIN, LLC, and WALTERBORO COMMUNITY HOSPITAL, INC. d/b/a COLLETON MEDICAL CENTER, | ) | |
| Defendants. | ) | |

This matter is before the Court on Defendant Stephen C. Miller, M.D. and Palmetto Cardiology and Vein, LLC's motion to dismiss or, in the alternative, motion for summary judgment (the "Motion"). (ECF No. 17). For the reasons discussed below, the Court denies in part and grants in part the Motion.

**PROCEDURAL HISTORY**

Plaintiff Melanie Anne Herman filed this action asserting two counts of retaliatory discharge in violation of 31 U.S.C. § 3730(h), one count as to Defendants Stephen C. Miller, M.D. (Dr. Miller) and Palmetto Cardiology and Vein, LLC (Palmetto Cardiology) and a second count as to Defendant Walterboro Community Hospital, Inc. d/b/a Colleton Medical Center ("CMC"). (ECF No. 1). Plaintiff thereafter amended her complaint twice. The second amended complaint ("SAC") is the operative pleading and asserts additional claims for intentional interference with contractual relations as to Dr. Miller, civil conspiracy as to all Defendants, and violation of S.C.

Code Ann. § 33-44-407. (ECF No. 15). All but the claim for statutory violation arise from Plaintiff's employment with Palmetto Cardiology and CMC and her ultimate termination. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and exercises supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.[1]

CMC filed an answer to the SAC. (ECF No. 18). The same day, Dr. Miller and Palmetto Cardiology filed the Motion, arguing that the SAC fails to state a claim for violation of § 3730(h), intentional interference with contractual relations, and civil conspiracy. (ECF No. 17). The Motion also argues that Plaintiff lacks standing to assert a violation of § 33-44-407, and that the claim is moot in any event. In the alternative, the Motion asks the Court to enter judgment in favor of Dr. Miller and Palmetto Cardiology on the basis that there is no dispute of fact as to the non-pretextual reason why Palmetto Cardiology fired Plaintiff, and on the basis that the doctrine of collateral estoppel operates to bar the claim. Plaintiff filed a response, (ECF No. 22), to which Dr. Miller and Palmetto Cardiology filed a reply, (ECF No. 23).

**FACTUAL BACKGROUND**

Plaintiff was employed as an accredited Nuclear Medicine Technologist by Palmetto Cardiology from April 2, 2007 until her termination on June 2, 2015. (ECF No. 15 at ¶ 3). Plaintiff was simultaneously employed by CMC for part of that time. She worked as an employee of CMC from 1997 through 1999 and again from 2005 until her termination on June 10, 2016. *Id.* During

---

[1] Plaintiff also asserts diversity jurisdiction under 28 U.S.C. § 1332 on the basis that she is domiciled in Virginia and Defendants are South Carolina citizens. Plaintiff asserts that Defendant Miller is "the sole and/or managing member of [Palmetto Cardiology]," and that CMC is a corporation with its principal place of business in South Carolina. (ECF No. 15 at ¶¶ 3-6). For purposes of federal diversity jurisdiction, a limited liability company is a citizen of each of the states where its members are citizens. *See Gen. Tech. Applications, Inv. v. Exro Ltda*, 388 F.3d 114, 120 (4th Cir. 2004). In its current form, the SAC does not adequately plead federal diversity jurisdiction.

2

the relevant time, Dr. Miller was licensed as a cardiologist and "billed himself as a cardiologist," but, Plaintiff asserts, Palmetto Cardiology operated "as a family or internal medicine practice," and provided "a broad range of care." (*Id.* at ¶¶ 8-9). Dr. Miller had hospital privileges at CMC, and many of Dr. Miller's patients received government medical benefits, including Medicare, Medicaid, and TRICARE. (*Id.* at ¶ 11). Plaintiff alleges in relevant part as follows.

In the course of her employment at Palmetto Cardiology, "Plaintiff became aware that Miller was performing or causing to be performed certain medical tests and procedures on patients that were unnecessary." (ECF No. 15 at ¶ 12). These tests and procedures included "Nuclear Stress Tests (NST), Echocardiograms, Electrocardiograms (ECGs), Carotid Dopplars (Carotids) and Venous Ablations (Ablations)." *Id.* Plaintiff became aware that "for many patients who tested normal on NSTs," Dr. Miller was "referring them out for unnecessary Catheterizations and 128 Slice CT Scans." *Id.* Dr. Miller would use his hospital privileges with CMC "to refer patients to his own practice at Palmetto Cardiology, where he would perform or cause to be performed" testing that, for many patients, was not medically necessary. (*Id.* at ¶ 13). Dr. Miller "treated many patients who were addicted to opioid pain killers, and he continued to prescribe such drugs to those patients, keeping them addicted, and Miller required those patients to submit to the above testing before he would renew their prescriptions." (*Id.* at ¶ 19). "For his patients receiving medical benefits under Medicare, Medicaid and TRICARE, Miller billed the government for the unnecessary tests and procedures." (*Id.* at ¶ 20). Additionally, Dr. Miller "performed unnecessary NSTs and other procedures on patients who were participating in clinical drug studies." (*Id.* at ¶ 21). Plaintiff was aware that "several of Miller's drug study participants had been treated at CMC's emergency room and [had] died shortly thereafter"; Plaintiff became "concerned that the deaths of those patients may have been related to the experimental drugs and that the circumstances

of their deaths needed to be investigated." (*Id.* at ¶ 22).

In or about the summer of 2014, Plaintiff reported her concerns about Dr. Miller to CMC's Ethics and Compliance Officer, who responded that Plaintiff's concerns would be passed along to the appropriate people. (ECF No. 15 at ¶ 23). Approximately one year later, Plaintiff "contacted Medicare" with her belief that Dr. Miller was committing Medicare and Medicaid fraud by "performing or causing to be performed certain medical tests and procedures on patients that were unnecessary and billing the federal government for those tests and procedures." (*Id.* at ¶ 24). Plaintiff also believed that Dr. Miller "was placing patients at risk of harm and that his unnecessary invasive testing had actually harmed some patients." (*Id.* at ¶ 25). In addition to Medicare, Plaintiff reported her concerns to "the South Carolina Professional Licensing Board and the FDA." (*Id.* at ¶ 26). An FDA investigator subsequently visited Palmetto Cardiology in May 2015 for an inspection and review of records belonging to patients who were participating in Dr. Miller's clinical drug studies. The investigator also met with Dr. Miller. (*Id.* at ¶ 27). Plaintiff observed that shortly after the FDA inspection Dr. Miller's behavior toward her changed and she believed he suspected her of reporting him to the FDA. (*Id.* at ¶ 28).

On June 1, 2015, Plaintiff received an email from a State Licensing Board investigator, who asked for certain patient records from Dr. Miller's office. During a telephone conversation with Plaintiff, the investigator stated she had spoken with Dr. Miller and informed him she was investigating a complaint against him. (ECF No. 15 at ¶ 35). Dr. Miller fired Plaintiff the following day, stating that he based the termination on the following: Plaintiff had used a homosexual slur in reference to a co-worker; Plaintiff left work early on May 14, 2015 before completing her NST patient reports; Plaintiff used the office internet for personal purposes; Plaintiff left work on May 18, 2015 before finishing a Stress Echocardiogram. (*Id.* at ¶¶ 36, 37).

4

Plaintiff believes that "Miller's conversation with the investigator alerted Miller that Plaintiff was the one who reported his actions." (*Id.* at ¶ 35). "After she was terminated from Palmetto Cardiology, Plaintiff was informed from several sources that Miller had complained that she had reported him to regulatory agencies and that he had to fire her because of her reports." (*Id.* at ¶ 38).

Plaintiff was still employed with CMC at the time. Plaintiff "spoke with officers at CMC, including its CEO and its CFO, and explained that she believed she had been terminated by Miller for providing information to the federal government about her concerns, and that she had voiced concerns about Miller a year earlier to CMC's Ethics and Compliance Officer"; she asked CMC to "look into her allegations and conduct its own investigation." (ECF No. 15 at ¶ 39). Plaintiff alleges that on information and belief, Dr. Miller had meanwhile complained to management at CMC that Plaintiff had reported him to Medicare and "was out to destroy him," and had asked CMC to fire Plaintiff. (*Id.* at ¶ 40). On or about August 14, 2015, CMC's supervisor of radiology advised Plaintiff that she "was prohibited from speaking about her concerns about Miller and that if she continued to do so, she would be fired." (*Id.* at ¶ 41).

In the spring of 2016, CMC demoted Plaintiff from her position as a Nuclear Stress Test Technologist to a receptionist. (*Id.* at ¶ 42). Plaintiff alleges the demotion was in retaliation for "reporting Miller's unnecessary tests and procedures to Medicare," for "reporting such conduct to CMC," and for "asking CMC to investigate [Miller's] treatment and billing of patients using his hospital privileges." *Id.* On June 10, 2016, CMC fired Plaintiff, stating as a basis for the termination that Plaintiff had allowed a patient to undergo an ultrasound without first formally registering with the hospital. (*Id.* at ¶ 43). The patient was a physician who had hospital privileges, and Plaintiff believed the patient had been registered, which is a function performed by a different

5

department. When Plaintiff understood the patient had not been registered, "she alerted her supervisors to the fact that the registration department had not processed the physician/patient." *Id.* Plaintiff alleges the basis for her termination from both positions is pretextual.

In addition, Plaintiff asserts that Dr. Miller has closed Palmetto Cardiology and is in the process of winding up the limited liability company. She alleges that during this process, Dr. Miller directed Palmetto Cardiology to make distributions to himself the effect of which was to cause Palmetto Cardiology to carry more liabilities than assets, in violation of S.C. Code Ann. § 33-44-406. (ECF No. 15 at ¶¶ 69-73).

## STANDARD OF REVIEW

### A. Federal Rule of Civil Procedure 12(b)(1)

Defendants Miller and Palmetto Cardiology move to dismiss the claim for violation of S.C. Code Ann. § 33-44-407 for mootness and lack of standing. Under Federal Rule of Civil Procedure 12(b)(1), a party may move to dismiss a cause of action based on lack of subject-matter jurisdiction. "Federal courts are not courts of general jurisdiction; they have only the power that is authorized by Article III of the Constitution and the statutes enacted by Congress pursuant thereto." *Brickwood Contractors, Inc. v. Datanet Engineering, Inc.*, 369 F.3d 385, 390 (4th Cir. 2004) (quoting *Bender v. Williamsport Area Sch. Dist.,* 475 U.S. 534, 541 (1986)). Challenges to jurisdiction under Rule 12(b)(1) can be raised in two different ways: facial attacks and factual attacks. *Thigpen v. United States,* 800 F.2d 393, 401 n.15 (4th Cir. 1986) (citing *Adams v. Bain,* 697 F.2d 1213, 1219 (4th Cir.1982)), *disagreed with on other grounds, Sheridan v. United States,* 487 U.S. 392 (1988). A facial attack questions the sufficiency of the complaint. *Id.* When presented with this argument, the court must accept the allegations in the complaint "as true, and materials outside the pleadings are not considered." *Id.*

6

**B.      Federal Rule of Civil Procedure 12(b)(6)**

Defendants Miller and Palmetto Cardiology also move to dismiss the claims asserted against them as insufficient as a matter of law. A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) examines the legal sufficiency of the facts alleged on the face of a plaintiff's complaint. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). To survive a Rule 12(b)(6) motion, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). A claim is facially plausible when the factual content allows the court to reasonably infer that the defendant is liable for the misconduct alleged. *Id.* When considering a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

Additionally, under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). As the Supreme Court held in *Twombly*, the pleading standard set forth in Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). Thus, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

**C.      Federal Rule of Civil Procedure 56**

The Court shall grant summary judgment "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, the burden then shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). If a movant asserts that a fact cannot be disputed, it must support that assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials"; or by "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

## **DISCUSSION**

As an initial matter, the Court considers Defendants Miller and Palmetto Cardiology's request that it consider materials outside of the pleadings. A court generally declines to consider matters outside of the pleadings in ruling on a Rule 12 motion. *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.,* 367 F.3d 212, 234 (4th Cir. 2004). A court may convert a motion to dismiss for failure to state a claim into a motion for summary judgment so as to consider matters outside of the pleadings; however, if a court so converts the motion it must give the plaintiff notice and an opportunity to present material pertinent to the motion. Fed. R. Civ. P. 12(d); *Bosiger v. U.S. Airways,* 510 F.3d 442, 450 (4th Cir. 2007). Although Plaintiff attaches a declaration and an exhibit to her response to the Motion, she asks that the Court not apply a Rule 56 analysis "as discovery has not yet officially commenced," (ECF No. 22 at 2), and, indeed, the Court notes that

the Parties have undergone no (or relatively little) discovery associated with this litigation. The Court therefore acts in its discretion to decline to convert the motion to dismiss into a motion for summary judgment. *See E.I. du Pont de Nemours and Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011) (explaining that "conversion is not appropriate where the parties have not had an opportunity for reasonable discovery"). Accordingly, the Court restricts its review of the Motion to the allegations set forth in the SAC.

### A. Retaliatory Discharge

The False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, discourages fraud against the federal government by imposing liability on "any person who . . . knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). Private parties can bring qui tam actions in the name of the United States to enforce the provisions of the FCA. *Glynn v. EDO Corp.*, 710 F.3d 209, 213 (4th Cir. 2013). Relevant to this action, the FCA includes an anti-retaliation provision to protect whistleblowers. *See* 31 U.S.C. § 3730(h). Section 3730 creates a cause of action for an employee who was discharged or otherwise discriminated against in the terms and conditions of her employment because of lawful acts undertaken by the employee in furtherance of a qui tam action or other efforts to stop a violation of the FCA. *Id.* at § 3730(h)(1). Among other things, the whistleblower provision "protect[s] employees while they are collecting information about a possible fraud, before they have put all the pieces of the puzzle together." *Young v. CHS Middle East, LLC*, 611 F. App'x 130, 132 (4th Cir. 2015) (quoting *United States ex rel. Yesudian v. Howard Univ.*, 153 731, 739 (D.C. Cir. 1998)). To state a claim for retaliation under the FCA, Plaintiff must allege that (1) she engaged in a protected activity; (2) her employer knew about the acts; and (3) the employer discharged her as a result of the acts. *Id.* (citing *Eberhardt v. Integrated Design & Const. Inc.*, 167 F.3d 861, 866

(4th Cir. 1999)). Defendants Miller and Palmetto Cardiology (hereinafter, "Defendants") argue that Plaintiff fails to meet the second and third prongs because she does not "plausibly allege[] Defendants' knowledge of any protected activity," and does not allege that Palmetto Cardiology terminated her in retaliation for that protected activity. (ECF No. 17 at 9). Specifically, Defendants contend that Plaintiff fails to allege that Defendants knew she had reported them to CMC, Medicare, the FDA, or the State Licensing Board, and that Palmetto Cardiology fired her as a result.

> Plaintiff alleges in relevant part the following:
>
> At or shortly after the FDA inspection, Miller's regular demeanor with Plaintiff changed drastically, He began to act short and curt with Plaintiff, giving her the "silent treatment," cancelling her scheduled patients, and ordering Plaintiff to take several days off from work.
>
> Based on Miller's behavior, Plaintiff suspected that Miller was aware that she had reported her concerns to the FDA which had prompted the inspection.
>
> On information and belief, Miller had actual knowledge or awareness after the [FDA] inspection that Plaintiff had reported her concerns to the FDA, as well as other [sic] state and federal agencies.
>
> Miller cancelled Plaintiff's NST appointments for Monday, June 1, 2015. That day, Plaintiff received an email from the State Licensing Board investigator, asking for certain records from Miller's office. Plaintiff called the investigator, who stated that she had spoken with Miller and told him she was investigating a complaint lodged against him and described for him the records she wanted to review. Upon information and belief, Miller's conversation with the investigator alerted Miller that Plaintiff was the one who reported his actions.
>
> After she was terminated from Palmetto Cardiology, Plaintiff was informed from several sources that Miller had complained that she had reported him to regulatory agencies and that he had to fire her because of her reports.

(ECF No. 15 at ¶¶ 28, 29, 30, 35, 38). Plaintiff also alleges that Dr. Miller, as the sole or managing member of Palmetto Cardiology, terminated her on June 2, 2015, and provided only pretextual reasons for the termination. (*Id.* at ¶¶ 36, 37). The Court finds that these allegations, viewed in a

10

light most favorable to Plaintiff, adequately assert that Dr. Miller was aware that Plaintiff had reported him to federal agencies with her suspicions that he was defrauding the federal government and, furthermore, that he, acting on Palmetto Cardiology's behalf, fired her as a result. *Smith v. Clark/Smoot/Russell*, 796 F.3d 424, 433 (4th Cir. 2015) (explaining that allegations offered in support of a retaliation claim "need pass only Civil Procedure Rule 8(a)'s relatively low notice-pleadings muster") (citations omitted). Accordingly, the allegations suffice to state a claim against Palmetto Cardiology for retaliatory acts in violation of the whistleblower provision.[2]

## B. Tortious Interference with Contract

Plaintiff claims that Dr. Miller intentionally interfered with her employment contract with CMC. (ECF No. 15 at ¶¶ 55-61). A plaintiff must allege the following to plead a claim for tortious interference with contract: "1) the existence of a contract; 2) knowledge of the contract; 3) intentional procurement of its breach; 4) the absence of justification; and 5) resulting damages." *Eldeco, Inc. v. Charleston County Sch. Dist.*, 642 S.E.2d 726, 731 (S.C. 2007). Defendants contend that Plaintiff fails to allege that Dr. Miller intentionally procured the breach "of Plaintiff's at-will contract," and further fails to allege the absence of justification. (ECF No. 17 at 16). Plaintiff asserts that Dr. Miller fired her on June 2, 2015, and that she thereafter continued working for CMC. Plaintiff alleges in relevant part as follows:

> In the days after her termination, Plaintiff spoke with officers at CMC, including its CEO and its CFO, and explained that she believed she had been terminated by Miller for providing information to the federal government about her concerns, and that she had had voiced concerns about Miller a year earlier to CMCs Ethics and Compliance Officer. She asked that the hospital look into her allegations and conduct its own investigation.
>
> Upon information and belief, Miller complained to management at CMC on numerous occasions that Plaintiff had reported him to Medicare and that Plaintiff

---

[2] Plaintiff's second cause of action is for a violation of § 3730(h) as to Defendant CMC, and therefore is not addressed herein.

11

> was out to destroy him. Miller demanded that CMC fire Plaintiff.
>
> On or about August 14, 2015, Plaintiff was advised by CMC's radiology supervisor that she was prohibited from speaking about her concerns about Miller and that if she continued to do so, she would be fired.
>
> In the spring of 2016, CMC demoted Plaintiff from her position as a Nuclear Stress Test Technologist to receptionist. This demotion was in retaliation for Plaintiff reporting Miller's unnecessary tests and procedures to Medicare and her reporting such conduct to CMC and asking CMC to investigate his treatment and billing of patients using his hospital privilege.
>
> On June 10, 2016, Plaintiff was terminated for allegedly allowing a patient, who was a physician with hospital privileges, to undergo an ultrasound without being formally registered. In fact, Plaintiff believed that the patient/physician had been registered, a function that was performed by another department. When Plaintiff realized he was not, she alerted her supervisors to the fact that the registration department had not processed the physician/patient.

(ECF No. 15 at ¶¶ 39-43). In addition to arguing that the SAC does not satisfactorily allege the third and fourth elements of the claim, Defendants contend that "there is no plausible temporal nexus" between when Plaintiff voiced her concerns to CMC and when CMC fired her. (ECF No. 17 at 17).[3]

The Court finds that Plaintiff has adequately alleged the elements of the claim. Dr. Miller's arguments regarding procurement of the breach, lack of justification, and lack of causation are better raised on a motion for summary judgment with reference to a full record.

## C. Civil Conspiracy

Plaintiff asserts that Defendants are liable for civil conspiracy. "A civil conspiracy is a combination of two or more persons joining for the purpose of injuring and causing special damage to the plaintiff." *McMillian v. Oconee Hospital, Inc.*, 626 S.E.2d 884, 886 (S.C.

---

[3] The Court notes that each of the cases Defendants cite in support of their argument regarding lack of temporal proximity was decided on summary judgment or at trial. *See* (ECF No. 17 at 17).

2006) (citing *Lawson v. S.C. Dep't of Corr.*, 532 S.E.2d 259, 261 (S.C. 2000)). "A claim for civil conspiracy must allege additional acts in furtherance of a conspiracy rather than reallege other claims within the complaint." *Hackworth v. Greywood at Hammett, LLC*, 682 S.E.2d 871, 874 (S.C. 2009). "Moreover, because the quiddity of a civil conspiracy claim is the special damage resulting to the plaintiff, the damages alleged must go beyond the damages alleged in other causes of action." *Id.* Accordingly, "[i]f a plaintiff merely repeats the damages from another claim instead of specifically listing special damages as part of their civil conspiracy claim, their conspiracy claim should be dismissed." *Id.* (citing *Vaught v. Waites*, 387 S.E.2d 91, 95 (S.C. App. 1989)).

Defendants argue that Plaintiff "has merely reiterated the allegations contained in her causes of action for tortious interference and two Section 3730(h) claims as the basis of her civil conspiracy claim." (ECF No. 17 at 20). Defendants further argue that the damages Plaintiff claims as a result of the alleged civil conspiracy are not materially different from the damages pleaded in association with the other claims. *Id.* Plaintiff responds that her "civil conspiracy cause of action contains independent allegations of a civil conspiracy that are not identical to the language contained in the other causes of action," and that "it is the concert of action, amongst the Defendants, that provides the basis of that claim and which caused damages different and greater than those caused by the other, independent wrongs." (ECF No. 22 at 12).

In her response, Plaintiff does not reference which allegations raised in the SAC she contends are independent of the allegations underlying the other causes of action. On review of the SAC, the Court notes that the allegations asserted in support of the conspiracy claim refer to Defendant Miller's interference with Plaintiff's employment with Palmetto Cardiology and CMC and Defendants Miller, Palmetto Cardiology, and CMC's "concerted actions . . . to terminate her

13

employment." *See* (ECF No. 15 at ¶¶ 64-68). The Court agrees with Defendants that the allegations merely reallege the claims for retaliatory discharge and tortious interference with contract. As for Plaintiff's contention that the allegations are independent of the other causes of action, she does not explain how they are independent. Accordingly, the Court finds that the allegations are insufficient to satisfy the notice pleading standard that requires "enough factual details to put the opposing party on fair notice of the claim and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. The Court will dismiss the civil conspiracy claim as to Dr. Miller and Palmetto Cardiology.

### D. Violation of Statutory Duty

Plaintiff's final cause of action asserts that Dr. Miller authorized distributions from Palmetto Cardiology to himself in violation of S.C. Code Ann. § 33-44-407. (ECF No. 15 at ¶ 72). Section 33-44-406(a) provides:

> A distribution may not be made if (1) the limited liability company would not be able to pay its debts as they become due in the ordinary course of business or (2) the company's total assets would be less than the sum of its total liabilities plus the amount that would be needed, if the company were to be dissolved, wound up, and terminated at the time of the distribution, to satisfy the preferential rights upon dissolution, winding up, and termination of members whose preferential rights are superior to those receiving the distribution.

S.C. Code Ann. § 33-44-406(a). Section 33-44-407(a) provides:

> A member of a member-managed company or a member or manager of a manager-managed company who votes for or assents to a distribution made in violation of Section 33–44–406, the articles of organization, or the operating agreement is personally liable to the company for the amount of the distribution which exceeds the amount that could have been distributed without violating Section 33–44–406, the articles of organization, or the operating agreement if it is established that the member or manager did not perform the member's or manager's duties in compliance with Section 33–44–409.

*Id.* at § 33-44-407(a). To establish liability under § 33-44-407(a), a plaintiff must demonstrate that (1) Defendant was a manager of a manager-managed LLC or a member of a member managed

14

LLC; (2) Defendant assented to or authorized a distribution in violation of § 33–44–406(a), the company's operating agreement, or the company's articles of organization; and (3) Defendant violated his or her fiduciary duties pursuant to § 33–44–409. *In re JK Harris & Company, LLC*, 512 B.R. 562, 568 (Bankr. D.S.C. Aug. 8, 2012).

Defendants assert that § 33-44-407, "[o]n its face," limits standing to pursue unlawful distributions to the injured limited liability company, arguing that the section states that a member who receives such a distribution is "personally liable to the company." (ECF No. 17 at 22). For support, Defendants rely on the Supreme Court of Colorado's treatment of what they contend is an analogous state statute in Colorado. *See id.* (citing *Weinstein v. Colborne Foodbotics, LLC*, 302 P.3d 263 (CO 2013) (discussing Colo. Rev. Stat. § 7-80-606(2)). Defendants further argue that "because all of Plaintiff's other claims should be dismissed . . . [this] claim . . . is moot, and should be dismissed as well." (*Id.* at 23). Plaintiff responds that South Carolina and the Fourth Circuit recognize that "a plaintiff may bring a cause of action to pierce a corporate veil in conjunction with an original claim against a corporate entity," and that, within "the context of the LLC Act, the stated causes of action are no different, [and] apply[] familiar concepts requiring adequate capitalization to meet known claims." (ECF No. 22 at 13). Plaintiff further responds that should she prevail in this action against Palmetto Cardiology, she would be "entitled to execute against the assets of the LLC itself which, at that point, would likely only be the statutory cause of action against a member who has violated the statutory restriction on distributions." (*Id.* (citing S.C. Code Ann. §§ 33-44-1101, 33-44-1102(2))). Plaintiff asserts that if the Court were to dismiss this claim, the application of the statute of limitations associated with § 33-44-407 would likely bar any relief. On reply, Defendants state that Plaintiff "ignores [their] cited authority," and "cites no authority addressing the statutory text which forms the basis of her claim." (ECF No. 23 at 14).

15

Defendants do not respond to Plaintiff's contention that should she prevail here against an insolvent Palmetto Cardiology, she would seek to stand in Palmetto Cardiology's shoes in an action against Defendant Miller for unlawful distributions.

As an initial matter, the Court perceives no basis on which to find the claim moot and denies the Motion as to that argument. As to Defendants' position regarding standing, "in determining state law a federal court must look first and foremost to the law of the state's highest court, giving appropriate effect to all its implications." *Assicurazioni Generali S.p.A. v. Neil*, 160 F.3d 997, 1002 (4th Cir. 1998). Where the highest court of the state "has not directly addressed the issue, a federal court 'must anticipate how it would rule.'" *Stahle v. CTS Corp.*, 817 F.3d 96, 100 (4th Cir. 2016) (quoting *Liberty Univ., Inc. v. Citizens Ins. Co. of Am.*, 792 F.3d 520, 528 (4th Cir. 2015)). The Parties do not cite to and the Court was unable to locate controlling law. *Cf. In re Derivium Capital, LLC*, 380 B.R. 407, 415 (Bankr. D.S.C. Dec. 22, 2006) (noting that § 33-44-407(b) provides the corporation "with a right of action against any of its members who receive distributions of corporate property in violation of applicable law").[4] Rather, Defendants' argument is limited to reciting the language of §§ 33-44-406 and 33-44-407 and citing a Colorado Supreme Court case with a parenthetical explanation as to its relevance. Of note, Defendants do not challenge and therefore appear to concede for the purpose of the Motion that the SAC alleges the elements of the claim. The Court is unwilling, on the briefs presently before it, to undertake the exercise of predicting how the Supreme Court of South Carolina would rule on the issue of standing. Defendants may raise the argument at a later date, at which time the Court would expect

---

[4] The Court does not find as persuasive Plaintiff's reference to *DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.*, 540 F.2d 681 (4th Cir. 1976), which addressed a plaintiff creditor's right to pierce the corporate veil to impose individual liability on the president of an indebted corporation. Plaintiff is not a creditor of Palmetto Cardiology.

from both sides more robust briefing as to how the Supreme Court of South Carolina would rule and why.[5]

## **CONCLUSION**

After careful consideration of the motion to dismiss, (ECF No. 17), and associated briefs and the applicable law, the Court hereby denies the motion to dismiss in part and grants it in part. The motion to dismiss is granted as to the civil conspiracy claim and is otherwise denied.

**IT IS SO ORDERED.**

/s/ Bruce Howe Hendricks
Hon. Bruce Howe Hendricks
United States District Judge

September 24, 2019
Charleston, South Carolina

---

[5] Should Defendants choose to reassert the argument on a Rule 12(c) or Rule 56 motion, and to the extent subject matter jurisdiction exists under 28 U.S.C. § 1331 only, the Court would direct the Parties to address whether it should decline to exercise supplemental jurisdiction over this claim.